900 So.2d 953 (2005)
STATE of Louisiana
v.
Wayne M. MILLS.
No. 04-KA-489.
Court of Appeal of Louisiana, Fifth Circuit.
March 29, 2005.
*956 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Juliet Clark, Assistant District Attorneys, Parish of Jefferson, Gretna, Louisiana, for Plaintiff/Appellee.
Holli Herrle-Castillo, Louisiana Appellate Project, Marrero, Louisiana, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., JAMES L. CANNELLA, and THOMAS F. DALEY.
EDWARD A. DUFRESNE, JR., Chief Judge.
Defendant, Wayne Mills, was indicted by a grand jury on July 20, 2000, and charged with second degree murder in violation of LSA-R.S. 14:30.1. On April 4, 2002, the *957 indictment was amended to add one count of obstruction of justice in violation of LSA-R.S. 14:130.1 and three counts of battery on a correctional facility employee in violation of LSA-R.S. 14:34.5. The state subsequently amended the three counts of battery on a correctional facility employee to three counts of battery on a police officer in violation of LSA-R.S. 14:34.2. Defendant pled not guilty to the original charge and all amended charges. He filed several pre-trial motions, including motions to suppress his confession, identification, and the evidence which were denied after a hearing.
On November 12, 2002, defendant proceeded to trial on counts one and two, second degree murder and obstruction of justice. After a four day trial, the twelve person jury found defendant guilty as charged on both counts. Defendant was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence for his second degree murder conviction and to eight years for his obstruction of justice conviction.[1] The sentences were ordered to run consecutively. Defendant now appeals.

FACTS
On Friday, September 17, 1999, Phelis Causey (a/k/a "Champ") and Karonja Taylor (a/k/a "Nick"), who are members of the rap group Ghetto Survivors, were recording music at Keep Selling Records, a recording studio owned by the victim, George Thompson (a/k/a "Dick"). Stanley Toval (a/k/a "Scooby"), a co-owner of the recording studio, and Kevin Alfred (a/k/a "Caveman" or "Cave"), an engineer for the recording studio, were also present at the studio and were working with Champ and Nick during their scheduled recording session. Later that evening, Scooby left, and defendant Wayne Mills (a/k/a "Messiah"), Lenard Hicks (a/k/a "Naughty"), and a third person referred to as "Little Guy," showed up at the studio. According to Cave, defendant was not scheduled to record. However, defendant testified Scooby and Cave called him that night and asked him to come finish some songs.
Dick, the owner/victim, arrived at the studio shortly thereafter and told defendant to leave. He and defendant exchanged words and a heated argument ensued.[2] Naughty, Little Guy, Cave, and Nick left the room and went downstairs. Champ, who was sitting at the mixing board, remained in the room while the victim and defendant continued to argue. Champ stated he could not hear what was being said between the victim and defendant because he was wearing headphones.
Meanwhile, a commotion began at the bottom of the stairs outside the second floor recording studio when Naughty attempted to re-enter the building. Cave tried to lock the door at the bottom of the stairs to prevent Naughty from going back up the stairs to the recording studio. Cave explained he was trying to calm down the situation. Nick stated he left the room where the victim and defendant were arguing because he heard a noise. When he went to the stairs, Nick saw Naughty trying to enter the building and Cave trying to stop him. Nick went down the stairs to talk to Naughty at which time he saw that Naughty had a gun. Defendant then came down the stairs and took the gun from Naughty.
*958 Defendant went back into the recording studio where Champ and the victim were. According to Champ, defendant walked into the room and put the .38 caliber gun to the victim's neck. The victim then drew his own gun. Champ explained that the two started hollering and fell into a tussle trying to grab each other's gun. Champ heard two gunshots at which time he fell to the floor and crawled out of the room. As he was crawling out, he looked back one last time and saw the victim on the floor against the wall with defendant standing over the victim.
Champ stated he stumbled down the stairs and out of the building where he saw Cave and Nick. Once outside, Champ, Cave, and Nick heard a third gunshot. Nick then saw defendant exit the building carrying two guns: one in his hand and the other in his crotch area. A sports utility vehicle/truck pulled up next to the building and defendant got in and left.
Defendant claims he went back into the recording studio to retrieve his personal belongings. He testified that the victim shot at him as soon as he entered the room and that he fired back. Defendant stated he and the victim started wrestling at which time he shot the victim in the neck. He explained they were still wrestling when the victim was shot in the head with his own gun. Defendant stated that both he and the victim were holding the gun when it discharged. He testified that he took both guns from the scene because his gun was jammed and he was not sure who was coming up the stairs to the studio.
After defendant left the building, Nick and Champ went back to the studio where Nick saw the victim lying on the floor, bent up against a table, in a pool of blood. The two went back to the gas station down the street where Cave was waiting and told him that Nick was dead. Instead of calling the police, Cave called Scooby, who subsequently came to the scene.
At approximately 9:00 p.m., a Domino's pizza delivery man arrived at the recording studio to deliver a pizza. It was his second pizza delivery to the studio that night, the first delivery occurring between 6:30 p.m.  7:00 p.m. During his first delivery, the delivery man found the wrought iron fence door at the bottom of the stairs leading up to the recording studio locked. He called the recording studio from his cell phone and three men came down the stairs and paid for the pizza. On his second delivery, the iron fence door was open. The delivery man proceeded up the stairs and found the door to the studio ajar. He went inside announcing "Domino's." There was no response so he continued to walk further into the studio where he found the victim lying on the floor with a pool of blood around his head. He ran back to his truck, called the store, and told his manager what he found. His manager then called the police.
The police arrived at the scene at which time Nick and Champ left in a taxi cab while Scooby and Cave stayed and talked to the police. During the course of the investigation, the police developed defendant and Naughty as suspects. Naughty was arrested approximately one week after the murder and defendant was arrested over one year later in California. Prior to defendant's arrest, he forwarded a videotaped statement and handwritten statement to Naughty's attorney admitting his involvement in the murder. However, defendant claimed he shot the victim in self-defense. At trial, defendant again admitted he shot the victim but suggested it was self-defense.
An autopsy revealed the victim suffered two gunshot wounds: one to the neck which was fired at close range where the muzzle of the gun was in contact with his *959 skin, and one to the head fired from an intermediate range, between ten to twelve inches away, which was the lethal wound.

SUFFICIENCY OF THE EVIDENCE
On appeal, defendant challenges the sufficiency of the evidence used to convict him of second degree murder. He specifically alleges that the state failed to prove beyond a reasonable doubt that he did not act in self-defense. In the alternative, defendant argues that the evidence only supported a conviction for manslaughter.
When, as in this case, issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the appellate court first determines the sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992). The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
Defendant was convicted of second degree murder which is defined, in pertinent part, in LSA-R.S. 14:30.1 A(1) as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Specific intent need not be proven as a fact but may be inferred from the circumstances and actions of the accused. State v. Woodhead, 03-1036 (La.App. 5 Cir. 1/27/04), 866 So.2d 995, 999, writ denied, 04-0598 (La.7/2/04), 877 So.2d 144. The determination of whether the requisite intent is present in a criminal case is for the trier of fact, and a review of the correctness of this determination is to be guided by the Jackson standard. State v. Simmons, 98-841 (La.App. 5 Cir. 6/1/99), 738 So.2d 1131, 1134, writ denied, 99-2419 (La.4/20/00), 760 So.2d 333. Flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience. State v. Cazenave, 00-183 (La.App. 5 Cir. 10/31/00), 772 So.2d 854, 860, writ denied, 00-3297 (La.10/26/01), 799 So.2d 1151.
Defendant admits that he shot and killed the victim but contends the shooting was committed in self-defense. According to LSA-R.S. 14:20(1), a homicide is justifiable "[w]hen committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." When a defendant claims self-defense, the state must prove, beyond a reasonable doubt, that the defendant did not act in self-defense. The determination of a defendant's culpability focuses on a two fold inquiry: 1) whether, from the facts presented, the defendant could have reasonably believed his life to be in imminent danger, and 2) whether deadly force was necessary to prevent the danger. While there is no unqualified duty to retreat from an altercation, the possibility of escape is a recognized factor in determining whether or not a defendant had a reasonable belief that deadly force was necessary to avoid the danger. State v. Woodhead, 866 So.2d at 1000. A person who is the aggressor or who brings on a difficulty cannot claim self-defense, unless he withdraws from the conflict in good faith. LSA-R.S. 14:21.
*960 When the trier of fact is confronted by conflicting testimony, the determination of that fact rests solely with the judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence. State v. Cassard, 01-931 (La.App. 5 Cir. 2/26/02), 811 So.2d 1071, 1077, writ denied, 02-0917 (La. 12/19/02), 833 So.2d 327.
In the present case, the evidence supports a finding that defendant did not kill in self-defense. It is undisputed that defendant and the victim were involved in a heated argument prior to the shooting. At some point during the argument, defendant exited the room leaving the victim and Champ behind. Instead of leaving the building, defendant obtained a gun from his friend, Naughty, and returned to the room where the victim was. While defendant testified he took the gun from Naughty to prevent a shooting, his actions proved otherwise. The only eyewitness, Champ, stated that defendant walked back into the room, immediately walked over to the victim who was on the telephone, and placed the gun to the victim's neck. It was only at this point that the victim pulled his gun. A reasonable juror could have concluded that defendant was the aggressor.
Defendant contends Champ's testimony could not be believed because he was a heroin addict that had entered into a plea agreement with the state prior to trial. Champ was fully questioned in front of the jury about his conviction and any deals he had with the state. He explained that at some point after the murder he was convicted of possession of heroin with the intent to distribute and sentenced to fifteen years. He specifically testified he was not offered any deals or promised anything for his testimony in the present case. On cross-examination, Champ denied he had any concerns about how his testimony would affect his current parole. The jury heard this testimony and was fully aware of the dynamics involved.
Defendant admitted numerous times during his testimony that he could have left the studio at any time during the argument but chose not to. He explained he returned to the room to gather his things. Defendant admitted that when he returned to the room he did not consider his life to be at risk. Although defendant testified the victim threatened to kill him, none of the other witnesses corroborated this portion of his testimony. By his own admission, defendant did not believe his life was in imminent danger when he returned to the room with a gun.
Additionally, defendant shot the victim twice. Defendant contends he fired the second shot into the victim's head during a continued struggle over the guns. However, according to Dr. Susan Garcia, the forensic pathologist, the victim would not have been capable of a vigorous fight after the first shot which caused a debilitating wound. Defendant also claims the shot into the victim's head was made with the victim's own gun during the struggle thereby suggesting it accidentally discharged. But, the physical evidence showed the victim was shot in the head with a .38 caliber gun. The record clearly established that the victim possessed a .40 caliber gun and defendant possessed the.38 caliber gun. Finally, defendant asserts he shot at the victim only after the victim shot at him. Defendant contends four shots were fired suggesting the first and third shots were fired by the victim and the second and fourth were fired by defendant in self-defense. The evidence showed otherwise. The physical evidence showed only three shots were fired; a fact corroborated by all the witnesses present near the scene who testified they heard three *961 shots. After the second shot was fired, Champ saw defendant standing over the victim who was lying on the floor against the wall. The witnesses then heard a third shot after a short delay.
Furthermore, defendant's actions after the shooting were not indicative of a person who had just killed another man in self-defense. Defendant immediately left the scene and took the victim's gun. He then fled to California and Mexico under an assumed name where he remained for over one year.
The jury was confronted with conflicting testimony and chose to accept the testimony of Champ, an eyewitness to the murder, while rejecting the defendant's claim of self-defense. It is not this court's function to reweigh the jury's credibility determination on appeal. Based on the evidence presented, we find that a rational trier of fact could have concluded that the state proved beyond a reasonable doubt that the homicide was not committed in self-defense.
Defendant alternatively contends the evidence only supports a conviction for manslaughter. He argues the victim bullied and threatened him thereby provoking him to the point he lost control. Manslaughter is defined as a homicide that would be second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. LSA-R.S. 14:31 A(1).
Sudden passion and heat of blood distinguish manslaughter from murder, but they are not elements of the offense. Rather, they are mitigatory factors which may reduce the grade of the offense. In order to be entitled to the lesser verdict of manslaughter, the defendant is required to prove the mitigatory factors by a preponderance of the evidence. State v. Johnson, 01-1362 (La.App. 5 Cir. 5/29/02), 820 So.2d 604, 610, writ denied, 02-2200 (La.3/14/03), 839 So.2d 32. Provocation and time for cooling are questions for the jury to determine under the standard of the average or ordinary person, one with ordinary self-control. State v. Deal, 00-434 (La.11/28/01), 802 So.2d 1254, 1260, cert. denied, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002). The issue on appellate review is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. State v. Lombard, 486 So.2d 106, 111 (La.1986).
In the present case, the jury could have reasonably concluded that the verbal argument was insufficient provocation to deprive an average person of his self control. The victim had simply told defendant to leave the recording studio which the victim owned. The record established no punches were thrown during the verbal altercation. Additionally, the shooting occurred only after defendant left the room and returned with a gun. Given these circumstances, defendant failed to show by a preponderance of the evidence that the verbal argument constituted sufficient provocation so as to warrant only a verdict of manslaughter.
Based on the foregoing discussion, we find that a rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could have found that the homicide was not committed in self-defense. We also find that defendant failed to prove by a preponderance of the evidence that he acted in sudden passion or heat of blood. Accordingly, the arguments raised by defendant in this assigned error are without merit.

*962 WITNESS' INVOCATION OF FIFTH AMENDMENT

On appeal, defendant also argues that the trial court improperly allowed the state to call Lenard Hicks as a witness because the state knew he would invoke a Fifth Amendment privilege in front of the jury and refuse to testify.
On the second day of trial, the state called Lenard Hicks to testify. Hicks, a co-defendant, had been previously convicted of manslaughter of George Thompson in June 2000, and was sentenced as a multiple offender in November 2000. See, State v. Hicks, 01-1064 (La.App. 5 Cir. 4/10/02), 817 So.2d 192, writ denied, 02-1580 (La.5/30/03), 845 So.2d 1068. Hicks answered the prosecutor's preliminary questions regarding his age and residence but when he was asked whether he knew defendant, Hicks stated, "I plead the Fifth on anything you have to ask me." Defense counsel lodged an objection.
Mr. Richard Tompson, chief indigent defender, immediately addressed the court and stated that he had spoken with Hicks prior to his testimony at the request of the state. Mr. Tompson stated that he explained to Hicks that he was being compelled to testify and that, as a result, he had immunity from prosecution on anything he might say. The prosecutor then explained to Hicks that he did not have a Fifth Amendment privilege and continued to question Hicks. The record shows the questioning continued for three pages and consisted of questions pertaining to Hicks' involvement in the shooting. Hicks asserted a Fifth Amendment privilege after most of the questions. Defense counsel declined to cross-examine Hicks stating, "I made my objections plain."
In State v. Smith, 04-340 (La.App. 5 Cir. 10/26/04), 888 So.2d 280, this court faced a similar issue when the defendant argued he was prejudiced when a witness invoked the Fifth Amendment in front of the jury. Similar to the present case, the witness had been previously convicted of the same crime for which the defendant was on trial. This court found that the witness did not have a Fifth Amendment privilege because he had already been convicted. Nonetheless, this court applied the two part test set forth in Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), to determine whether reversible error had been committed when the witness refused to answer in the presence of the jury. The two part test inquires into 1) whether there was any prosecutorial misconduct, and 2) whether the witness' refusal to answer added critical weight to the prosecution's case. This court concluded there was nothing in the record to suggest that the state knew the witness would invoke a Fifth Amendment privilege, and thus, there was no evidence of prosecutorial misconduct. This court also found the invocation of the privilege did not add critical weight to the prosecutor's case in a form not subject to cross-examination because the witness was only asked two questions, one pertaining to his residence and the other to his conviction, before the jury was removed.
Likewise, in the present case, Hicks did not have a valid Fifth Amendment privilege to assert since he had already been convicted. Nonetheless, applying the Namet analysis, we find that Hicks' assertion of the non-existent privilege in front of the jury was harmless. Contrary to defendant's claim that the state was aware Hicks would assert a privilege, the record does not show the state knew Hicks would attempt to invoke a Fifth Amendment privilege. Prior to trial, there was some discussion among the parties about Hicks testifying. However, the discussion centered on the state's ability to mention Hicks' conviction during its opening statement *963 and defendant's objection to the reference on the basis of prejudice. During the discussion, the trial court inquired into Hicks' willingness to testify. Specifically, the trial court asked the state, "[w]hat if [Hicks] refuses to say anything?" The state responded that Hicks did not have a Fifth Amendment privilege and the discussion regarding the mentioning of Hicks' conviction during opening statements resumed. The state noted that it had not spoken to Hicks but expected Hicks to be recalcitrant. No further discussion was held regarding Hicks' willingness to testify, not even when the state called him as a witness during trial. Based on these circumstances, we do not find that there was any prosecutorial misconduct.
Furthermore, Hicks' refusal to answer did not add any critical weight to the prosecution's case in a form not subject to cross-examination. As pointed out by the state in its appellee brief, all the questions posed to Hicks were answered by defendant and other witnesses during their trial testimony. Furthermore, the evidence against defendant was overwhelming. He admitted shooting the victim. Hicks was not asked any questions which would have led to information that would have had any bearing on defendant's claim of self-defense.
Based on the foregoing discussion, we find that defendant was not prejudiced by Hicks' assertion of a non-existent Fifth Amendment privilege in front of the jury. Accordingly, this assigned error is likewise without merit.

FAILURE TO GRANT MISTRIAL
In another assigned error, defendant argues that the trial judge erred in denying his motion for a mistrial after the trial judge made prejudicial, berating comments against defense counsel and threatened to remove defense counsel from the courtroom for simply stating an objection. Defendant maintains the trial judge's comments caused the jury to be annoyed with defense counsel which prejudiced defendant.
During the testimony of Lenard Hicks, defense counsel objected to Mr. Richard Tompson, chief indigent defender, addressing the court.[3] The trial judge overruled defense counsel's objection and asked Mr. Tompson to continue. Mr. Tompson attempted to continue with his statement at which time defense counsel objected again. Addressing defense counsel, the trial judge stated, "Please don't make me remove you from the courtroom. You made an objection. I overruled it." Defense counsel then moved for a mistrial. The trial judge instructed defense counsel to sit down. Defense counsel again requested a mistrial and the trial judge again told him to sit down. Defense counsel noted his objection and the trial judge denied the motion for a mistrial. The trial judge further stated, "If your purpose is to disrupt, you're not going to do it. Be seated, Mr. Regan." Thereafter, defense counsel objected to the comment of the trial judge. The trial judge instructed defense counsel to sit down a final time after which Mr. Tompson successfully addressed the court.
Complete neutrality on the part of the presiding judge is essential to the concept of a fair trial. State v. Johnson, 438 So.2d 1091, 1101 (La.1983). A trial judge's disparaging remarks or intemperate criticism of defense counsel may constitute reversible error when such remarks adversely influence and prejudice the jury against the defendant. However, in order to constitute reversible error, the
*964 effect of the improper comments must be such as to have influenced the jury and contributed to the verdict. State v. Hubbard, 97-916 (La.App. 5 Cir. 1/27/98), 708 So.2d 1099, 1105, writ denied, 98-0643 (La.8/28/98), 723 So.2d 415.
Defense counsel made his objection and the trial court overruled it. Nonetheless, defense counsel continued to make the same objection over the same issue, thereby unnecessarily interrupting the proceedings. The trial judge's comment was justified in preserving order in the courtroom and in moving the trial forward. Additionally, the trial in the present case lasted four days. The above cited exchange was the only one of its kind over the four day span. It cannot be said the one comment by the trial judge prejudiced the jury against defendant. Accordingly, this assigned error is without merit.

OTHER CRIMES EVIDENCE
On appeal, defendant also asserts that the trial court erred in allowing the state to present evidence pertaining to defendant's three counts of battery on a police officer during trial. He argues that evidence of a 2002 altercation was irrelevant to show intent, knowledge or lack of mistake in the 1999 murder case. Defendant maintains that the evidence of the batteries was only intended to show he was a bad person and, therefore, was inadmissible.
Defendant was initially scheduled for trial on the second degree murder charge on March 19, 2002. However, due to his involvement in an altercation with deputies at the jail, defendant's trial was postponed. After the altercation, the indictment was amended to charge defendant with three counts of battery on a police officer and one count of obstruction of justice. The three counts of battery on a police officer were severed from the trial on the second degree murder and obstruction of justice charges. Prior to trial, the state filed a notice of intent to use defendant's statement, made during the alleged batteries, at trial.
A hearing was held on the admissibility of the other crimes evidence. During the hearing, Detective Donald Clogher testified that defendant was involved in an altercation with several deputies on the day he was scheduled for court. The state introduced documentation showing defendant had made the following statement to one of the deputies during the altercation: "[C]heck my jacket, see what I'm charged with, you're dead. . . . Your a* * is dead, I'll kill you." The state argued the altercation was yet another attempt by defendant to avoid trial thereby showing his guilty knowledge that he had committed a crime. The state also asserted the statement made by defendant showed his intent in committing the murder.
The trial court agreed and granted the state's request to use evidence of the batteries and statements made by defendant during the batteries. The trial court explained the other crimes evidence showed intent, knowledge, and absence of mistake/lack of accident and went to refute defendant's self-defense claim.
Generally, evidence of other crimes or bad acts committed by a criminal defendant is not admissible at trial. LSA-C.E. art. 404 B(1); State v. Prieur, 277 So.2d 126, 128 (La.1973). However, when such evidence tends to prove a material issue and has independent relevance other than showing that the defendant is of bad character, it may be admitted by certain statutory and jurisprudential exceptions to the exclusionary rule. Evidence of other crimes is allowed to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or *965 when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceedings to such an extent that the state could not accurately present its case without reference to the prior bad act. LSA-C.E. art. 404 B(1); State v. Dauzart, 02-1187 (La.App. 5 Cir. 3/25/03), 844 So.2d 159, 165.
In order for other crimes evidence to be admitted, certain requirements must be met. One requirement is that one of the factors enumerated in LSA-C.E. art. 404 (1) must be at issue, have some independent relevance, or be an element of the crime charged. State v. Jackson, 93-0424 (La.10/18/93), 625 So.2d 146, 149; State v. Maise, 99-734 (La.App. 5 Cir. 3/22/00), 759 So.2d 884, 893, writ granted, 00-1158 (La.9/14/01), 795 So.2d 1219, judgment affm'd, 00-1158 (La.1/15/02), 805 So.2d 1141. Another requirement is that the probative value of the extraneous evidence must outweigh its prejudicial effect. LSA-C.E. art. 403; State v. Maise, 759 So.2d at 894.
In the present case, we agree with defendant that the trial judge erred in admitting the other crimes evidence. Defendant's altercation with deputies two and one-half years after the murder and the statements he made during the altercation do not have any independent relevance to the crime charged. The evidence at issue was not relevant for the purpose of showing intent, knowledge or lack of mistake/accident as found by the trial judge.
However, the erroneous admission of other crimes evidence is subject to harmless error analysis. State v. Lyles, 03-141 (La.App. 5 Cir. 9/16/03), 858 So.2d 35, 46. The test for determining harmless error is "whether the guilty verdict actually rendered in this trial was surely unattributable to the error." Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); State v. Morgan, 99-1895 (La.6/29/01), 791 So.2d 100, 104.
In the present case, we find that the verdict actually rendered was surely unattributable to the error. First, the trial court gave the jury a limiting instruction regarding other crimes evidence. Secondly, it is likely that the jury based its verdict on defendant's admission that he killed the victim, that he could have left the studio during the argument but chose not to, that he did not think he was in imminent danger when he returned to the room with a gun, and on the testimony of Champ who stated defendant left the room, returned with a gun, and immediately placed the gun to the victim's neck.
Given the circumstances of this case and the overwhelming evidence against defendant, we find that the trial judge's error in admitting the other crimes evidence was harmless. Accordingly, this assigned error is without merit.

ERROR PATENT DISCUSSION
We have also reviewed the record for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). Our review reveals that the trial court failed to properly inform defendant of the prescriptive period for filing post-conviction relief pursuant to LSA-C.Cr.P. art. 930.8. The trial court simply advised defendant that he had "two years from the date [his] sentence becomes final to file for post-conviction relief." This court has held that the failure to advise a defendant that the prescriptive period runs from the time his conviction and sentence become final is incomplete. See, State v. George, 99-887 (La.App. 5 Cir. 1/4/00), 751 So.2d 973, 975. Therefore, we remand to the district court with instructions to inform defendant of the *966 proper provisions of LSA-C.Cr.P. art. 930.8 by sending appropriate written notice to defendant within ten days of the rendition of this opinion, and to file written proof in the record that defendant received the notice.
Accordingly, defendant's convictions and sentences are affirmed, and the matter is remanded with instructions.
CONVICTIONS AND SENTENCES AFFIRMED; REMANDED WITH INSTRUCTIONS.
NOTES
[1] Following defendant's convictions on counts 1 and 2, the state entered a nolle prosequi with respect to the three counts of battery on a police officer.
[2] The testimony established that the victim and defendant argued two days earlier over a comment made by defendant about the victim's voice on the studio's answering machine.
[3] Mr. Tompson was in the process of explaining that, at the request of the state, he had met with Hicks and advised him regarding his testimony.