STATE OF LOUISIANA

VERSUS

JOSE ROBLES MARQUES AKA JOSE
JOVANY ROBLES MARQUES AKA JOVANNY
JOSE ROBLES MARQUES AKA JOSE
JOVANNY MARQUES

NO. 23-KA-503

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 22-933, DIVISION "I"
HONORABLE NANCY A. MILLER, JUDGE PRESIDING

August 07, 2024

**STEPHEN J. WINDHORST**
**JUDGE**

Panel composed of Judges Stephen J. Windhorst,
John J. Molaison, Jr., and Amanda L. Calogero, Pro Tempore

**CONVICTION AND SENTENCE AFFIRMED**
    **SJW**
    **JJM**
    **ALC**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
Honorable Paul D. Connick, Jr.
Thomas J. Butler
Andrea F. Long
Eric Cusimano
Taylor Somerville

COUNSEL FOR DEFENDANT/APPELLANT,
JOSE ROBLES MARQUES
Gwendolyn K. Brown

**WINDHORST, J.**

On appeal, defendant, Jose Robles Marques, challenges the sufficiency of the evidence used to convict him of second degree murder. For the reasons stated herein, we affirm defendant's conviction and sentence.

## PROCEDURAL HISTORY

On June 9, 2022, a Jefferson Parish Grand Jury returned a bill of indictment charging defendant, Jose Robles Marques a/k/a Jose Jovany Robles Marques a/k/a Jovanny Jose Robles Marques a/k/a Jose Jovanny Marques, with the second degree murder of Jose Salomon Fernandez Barrientos a/k/a Jose Salomon Fernandez a/k/a Jose Fernandez Salomon, in violation of La. R.S. 14:30.1. Defendant was arraigned and pled not guilty.

On June 20, 2023, a unanimous twelve-person jury found defendant guilty as charged. Defendant filed a motion for new trial which was denied. On June 28, 2023, defendant was sentenced to life imprisonment without the benefit of parole, probation, or suspension of sentence. This appeal followed.

## EVIDENCE

In 2022, defendant lived with his sister, Alga Marina Robles Marquez ("Alga"), Alga's boyfriend/the victim, Jose Salomon Fernandez ("Salomon"),[1] and defendant's partner, Ramona Lechuga[2] ("Ramona") at 1709 Newton Street in Gretna.[3] Alga's seventeen-year old daughter, Olga,[4] and her two younger sons, Jonathan and Isaiah, also resided in the house.[5] Alga testified she was close to her brother (defendant) and he was protective of her.

---

[1] At trial, Felipa Vanessa Espinoza testified that at the time of the shooting, she was still legally married to Salomon; but they had been living separate and apart since after Hurricane Ida. She knew Salomon was living with his girlfriend Alga and their children spent time with him at Alga's house.

[2] Ramona is also referred to as Ramona Pineda by some of the witnesses and counsel in the record. However, during the trial, Ramona testified her last name was Lechuga. For consistency purposes, she will be referred to as Ramona in this opinion.

[3] Ramona testified she did not live with defendant and Alga; she was only visiting. She explained she came to spend Christmas with Alga and defendant in December 2021, and was still at their house on the date of the shooting.

[4] Olga was also referred to as "Lady."

[5] Jonathan and Isaiah are 11 and 8 years old.

On March 1, 2022, everyone in the household went to a Mardi Gras parade in New Orleans except defendant, who was at work. They returned to the house around "3:00 or 3:30" P.M. at which time, Olga, went to her room to lie down and the two boys went outside. Alga testified she and Salomon left to get crawfish, and during that time, they argued because Salomon wanted her to purchase a car in her name, and she did not want to do it. Upon returning, Alga, Salomon, and Ramona ate crawfish and had a few drinks at the dining room table. Defendant joined them for a beer after he arrived home at 4:00 P.M. Alga testified that defendant and Salomon did not have a fight while sitting at the table together. Soon afterwards, Salomon got up and went alone to the bedroom he shared with Alga. Alga started receiving text messages from Salomon and she joined him a few minutes later. When she went into the bedroom, Alga testified Salomon was sitting on the bed.[6] Alga testified they started verbally fighting and they were screaming loudly at each other. She further stated that at one point, Salomon grabbed her by the neck.

Shortly after Alga left the room, Ramona testified she left the dining room area to go to the bathroom and to get her cellphone. As she passed by Alga's bedroom, she knocked on the door to see if Alga wanted to come in the other room and sing with her. Alga opened the door and said she would be out "in a little bit." Ramona admitted she did not knock on the door to "check on" Alga. After Ramona returned to the table, defendant got up and left. Because defendant headed in the direction of the bathroom, Ramona thought that is where he was going. She acknowledged that the bathroom was close to Alga and Salomon's bedroom. Ramona stayed at the dining room table and listened to the music.

Upon hearing Salomon and Alga arguing in the bedroom, defendant left the dining room area, went to his bedroom and obtained a .38 revolver from a green bag

---

[6] When questioned whether she previously told the police Salomon was lying down on the bed, Alga testified she did not remember what she said because she was in shock at the time.

located in his suitcase, which was in the closest in his bedroom. Defendant loaded the revolver with bullets and then went to Alga and Salomon's bedroom. Defendant entered the bedroom and stood by the door. Salomon was lying on the bed, propped up against the headboard, and Alga was standing by the bed. When defendant entered the room, Alga testified defendant told them to stop fighting and that they "should separate" because they could not live together. Defendant and Salomon had words. Defendant asked Salomon if he remembered the time he commented that with his money he could have any woman he wanted. Defendant told Salomon "your time has come" and shot Salomon, using all bullets in the gun. Defendant then returned to his bedroom where he emptied the spent shell casings and reloaded the revolver in case Salomon was still alive.

While sitting at the table, Ramona testified she heard "the shots" but did not see anything. Once she realized the sound was not from her music, Ramona went to the bedroom where Alga said to her, "Look. Look what happened. . . . Sister-in-law, look what he did." Ramona asked Alga what happened. When Ramona looked, she saw Salomon lying on the bed and testified that "he had already killed him." Ramona then headed in the direction defendant had previously gone but "by that time he was already standing in the living room" area.

Upon hearing gunshots, Olga woke up and ran outside the house where she called 9-1-1 with assistance of her younger brother in translating.[7] She testified she heard approximately "five" gunshots "more or less." Olga testified she was "very nervous" during the 9-1-1 call and she was trying to tell the police that her "uncle," defendant, shot her mother's boyfriend.[8] During the call, Olga indicated the shooter was still in the house. Police officers with the Gretna Police Department arrived while Olga was on the phone. Olga stated she was asked a few questions at the house

---

[7] The 9-1-1 recording was played to the jury during Olga's testimony.

[8] Olga also referred to Salomon as her "stepfather." The 9-1-1 recording indicates that her mother's husband was shot.

and was later interviewed at the police station. She stated that most of the officers spoke English and believed one officer spoke Spanish, but could not remember. Although she did not see or hear anything prior to the gunshots, Olga testified she remembers seeing defendant with a gun.

Officer Brittany Pujol of the Gretna Police Department was the first to respond to the scene at 1709 Newton Drive.[9] Dispatch stated "someone was shot" at that location, but Officer Pujol testified she did not have any further information regarding the situation because of the "language barrier." When she arrived at the scene, Officer Pujol had her weapon drawn because she did not know who the perpetrator was at that point. Olga was outside and pointed to the house.[10] Defendant and Ramona were visible inside the house and Officer Pujol directed them outside. Defendant walked out of the house calm and with his hands raised in the air. He did not resist. Officer Pujol told him to get on the ground and he replied in Spanish. Because of the language barrier, she had defendant put his hands on a nearby car. Officer Pujol stated that at this point the scene was not secure, she did not know how many people were still in the house, and she handcuffed defendant.

While Officer Pujol was with defendant, other officers arrived on the scene, including Officer Jose De Los Angeles, who speaks Spanish and often acts as a translator for the Gretna Police Department. Officer Pujol and a few of the officers proceeded into the house, weapons drawn, to secure the scene. In a bedroom at the end of the hallway, the officers found Salomon dead lying on the bed with his back and head resting against the headboard. The testimony at trial from the officers and EMS personnel indicated that Salomon's body had not been moved and he was in the same position as when he was shot.[11]

---

[9] By the time of the trial, Officer Pujol had become a detective in the Criminal Investigations Division.

[10] Officer Pujol was wearing a body camera when she arrived on the scene and the video footage was played to the jury during her testimony.

[11] Officer Brandon Matika testified that he applied a tourniquet to Salomon's arm but did not move his body. Jeremy Hebert, a former paramedic with the Gretna Police Department EMS Division, testified he observed

While officers were securing the scene, Officer De Los Angeles patted defendant down outside the house. He felt something in the waistband of defendant's pants and removed a loaded firearm.[12]

During the investigation, officers learned defendant lived at the residence, the firearm recovered from defendant's waistband was a .38 revolver, and that the revolver was used to shoot Salomon. Search warrants for the residence, defendant's vehicle, a DNA buccal swab from defendant, and defendant's clothing were obtained along with an arrest warrant for defendant. Officers observed a green bag sitting in an open suitcase on defendant's bed and six spent shell casings on the floor in defendant's bedroom.[13] Defendant was advised of his rights in Spanish, arrested, and he made a statement. Defendant was taken to the police station where he was advised again of his rights in Spanish and gave a recorded statement in which he admitted to shooting Salomon. Officer De Los Angeles served as the translator during defendant's recorded statement.[14]

While reviewing his body camera footage from the scene, Officer De Los Angeles testified he advised defendant of his rights in Spanish. Defendant informed him that a few days before the shooting, Salomon threatened to kill his sister, Alga. Defendant then described a fight between Salomon and Alga that had turned physical and Salomon said he was going to choke his sister. Officer De Los Angeles testified that defendant stated "the timeframe was three in the morning," and further commented "who would want their family member to get killed like that." Officer De Los Angeles clarified that defendant did not state that Salomon threatened Alga,

---

that Salomon sustained a gunshot wound to the chest and was deceased. Mr. Hebert testified that although the police entered the house before he arrived, he believed Salomon was in the same position he was first found by the police, which he described as "slumped" over in the back of the bed against the headrest. Mr. Hebert did not recall seeing any bruising or scratches on Salomon.

[12] Officer De Los Angeles' body camera footage was played to the jury.

[13] A seventh spent shell casing was located in a closed drawer in defendant's bedroom.

[14] Detective Ralph Dunne testified he responded to the scene but was immediately asked to interview defendant with the assistance of Spanish-speaking Officer De Los Angeles. He recalled the interview lasting thirty or forty minutes and stated defendant was responsive to all his questions.

choked Alga, or lunged at him the day of the shooting. Officer De Los Angeles testified defendant admitted he shot Salomon.

Haiey Ochoa, an expert in Spanish translation, translated and testified as to defendant's statement on the scene and defendant's recorded statement. After reviewing Officer De Los Angeles body camera footage from the scene, Ms. Ochoa confirmed 1) defendant was read his rights in Spanish; and 2) defendant stated Salomon and Alga fought fifteen days prior to the shooting, during which they were yelling and Salomon threatened to choke Alga. Ms. Ochoa also confirmed that defendant stated he went into the bedroom the day of the shooting and told Salomon that he "could not mock his family." She confirmed defendant did not state anything about what he saw when he entered the bedroom, nor did defendant mention his sister being choked by Salomon, Salomon lunging toward him, or that he physically fought with anyone. Ms. Ochoa confirmed defendant told the officer that it was Salomon's turn to go to heaven. Ms. Ochoa related that the body camera footage showed defendant asking the officer if Salomon was dead and stating that he would like for Salomon to be dead.

As to his recorded statement, Ms. Ochoa confirmed defendant stated that fifteen days ago, his sister and Salomon were fighting outside. His sister went into the house crying and he stayed with Salomon. Salomon told defendant at the time that he had money and could get any woman he wanted. Defendant then stated Salomon and Alga were in the bedroom fighting and Salomon choked his sister. Defendant told the officer that this incident occurred fifteen days before the shooting and was seared in his brain.

Ms. Ochoa further testified that during his statement, defendant informed the officer that on the day of the shooting, Salomon and Alga were arguing in the bedroom. Defendant said he was going to defend his family. He was going to defend his sister. Defendant stated he went to his room and armed himself prior to going to

the bedroom. Defendant entered the bedroom and stood by the door. He said that Alga was standing and Salomon was lying on the bed and he asked them what was going on. As Salomon began to say something about a few days ago, defendant recounted that he told Salomon that his time had come, and then he fired at him. Ms. Ochoa confirmed defendant told the officer that he did not know how many shots he fired at Salomon but that he emptied his gun and went back to his room to reload. After reloading, defendant put the gun back in his waistband. When asked if he ever had a problem with Salomon, defendant said no, but then stated Salomon "opened his mouth and said that." Defendant said "today was the day." Defendant was asked if an argument was enough to take someone's life, to which he replied, "No, not an argument. But what he had said before that he could have many women, and he can pick any woman at any time." Defendant then commented again about a prior fight between Salomon and Alga when Salomon choked Alga, stating that the incident occurred a month or two ago.

When asked again about shooting Salomon, Ms. Ochoa confirmed that defendant said he heard screaming, he went to his bedroom where he retrieved and loaded his gun, and then went to the bedroom. Defendant stated that he did not know if Salomon grabbed Alga and he stated Salomon was propped up in the bed. When asked why he went back to his room after he shot Salomon, defendant replied that he reloaded his weapon in case Salomon was still alive. Defendant was asked about the suitcase on his bed, and he stated he put it there when he retrieved his gun from the green bag in the suitcase. Ms. Ochoa testified that when defendant was asked what his intention was when he shot Salomon, defendant initially stated he did not know what was going to happen because Salomon threatened his sister. Defendant then stated it was his intention "to send [Salomon] to the other side" and defendant confirmed that he meant to kill Salomon. Defendant repeated he wanted to kill Salomon because he threatened his sister.

After the shooting, Alga fainted and received treatment from EMS personnel at the scene. Alga testified she did not show EMS personnel any injuries on her body or neck because "he didn't even leave marks. He was just grabbing me." No noticeable injuries or scratches were observed by EMS personnel. Alga admitted she signed a form refusing further medical treatment.

Alga testified that she fought a lot with Salomon and it started about five months into their relationship.[15] She stated that defendant knew about the fights and he heard them "one time" about "fifteen days" prior to the shooting, when she was fighting with Salomon and Salomon choked her. Defendant walked in the room but did not see Salomon choking her because they heard defendant coming and separated from each other. When asked if Salomon ever threatened her, Alga replied "Yes. He told me he was not going to leave the house." She stated that "[s]ometimes" she was afraid of him. She could not explain why she did not tell the police about her fights with Salomon.

At trial, Alga admitted 1) she did not tell the police at the scene or at the police station about the fight with Salomon while getting crawfish, nor did she did not tell counsel for the State when they previously met; 2) she did not tell the police that she and Salomon were fighting in the bedroom at the time of the shooting; 3) she did not tell the police that there was a physical argument between her and Salomon immediately prior to the shooting, or that Salomon grabbed her neck, even though she knew her brother was arrested for killing Salomon; 4) she never told the police about Salomon abusing her physically before or on the day of the shooting; 5) she did not tell defendant that Salomon was physical with her; 6) she did not tell the

---

[15] Alga also testified that she was in a car accident with Salomon in January of 2022. Alga stated Salomon was driving and they started arguing. When they reached a streetlight, she took her seatbelt off, and told Salomon she was getting out. There was a car in front of them and Salomon "sped off" which caused the accident. She stated this accident caused her heart condition. She did not feel bad the day of the car accident but then she had a stroke due to her head injury. Alga acknowledged she did not tell the police they were fighting when the police showed up at the scene of the accident, nor did she tell the doctors at the hospital about the fight in the car prior to the accident.

police or the hospital about her fight with and Salomon's actions during a car accident a few months prior to the shooting; and 7) she did not tell police about Salomon "lunging" toward defendant prior to the shooting. Alga explained she did not tell the police any of these facts at the time of the shooting because she was in shock. However, she did provide a statement to the Public Defender's Office about a year after defendant was arrested for Salomon's death regarding all the fights and abuse, and how defendant saw Salomon grab her neck when he entered the room and how Salomon lunging at defendant.[16] She testified she did not state anything at the scene or later at the police station because she was in shock. She testified she loves her brother regardless of what happened to Salomon. Alga testified that she did see her brother, defendant, shoot Salomon because she was in the room at the time of the shooting.

At trial, Dr. Dana Troxclair, the chief forensic pathologist at the Jefferson Parish Coroner's Office, testified she observed eight gunshot wounds while examining Salomon, but acknowledged that fewer than eight shots could have fired. She stated toxicology showed no drugs or alcohol in Salomon's system, only caffeine. Dr. Troxclair identified four bullets and some bullet fragments on an x-ray of Salomon's upper body and stated Salomon also had a gunshot wound to his left temporal scalp. Dr. Troxclair stated she did not see indications that the fatal gunshot wound to the head was a contact or near contact wound or inflicted from a range of two to four feet. She also stated that the fatal gunshot wound to the chest was a distant range gunshot wound, which means it was inflicted from over two to three feet away. Dr. Troxclair additionally identified other wounds which were inflicted from a distance. She stated that the trajectory of the wounds showed that one of the

---

[16] Alga stated defendant saw Salomon physically grabbing her by the neck on the day of the shooting. She explained that defendant and Salomon had words and then defendant shot Salomon. Later in her testimony, Alga stated that when defendant entered the room, Salomon was holding her neck and let her go and then Salomon "tried to go towards" defendant. When asked if Salomon was "trying to go at [defendant] to grab [defendant], Alga replied "Yes." She further stated Salomon was "aggressive and he was screaming" immediately prior to defendant shooting Salomon.

bullets went through the victim's left forearm and entered his chest. Based on the trajectory of this bullet and others, as well as bruising, Dr. Troxclair testified the victim's arms were likely in front of his chest when the projectiles entered the chest. Accordingly, she classified Salomon's death as a homicide.

## LAW and ANALYSIS

On appeal, defendant contends the evidence was insufficient to convict him of second degree murder when the unrebutted evidence established the elements of the responsive verdict of manslaughter. Defendant avers the crime was committed when he was distraught over the abuse his sister was suffering at the hands of her boyfriend, Salomon. He contends he was close to and protective of his sister and fifteen days prior to the fight that lead to the killing, he witnessed Salomon choking his sister, and Salomon had previously threatened to kill his sister. Defendant asserts the night he shot Salomon, Salomon was in a "heated, abusive fight with his sister." Defendant claims he was still in a "state of heightened distress" when the police arrived on the scene. He asserts the killing was committed during a time when he was acting "in the heat of blood sufficient to deprive a reasonable man of his cool sense and calm reflection." Therefore, defendant contends that the circumstances were sufficient to deprive a reasonable, average man of his cool thought and calm reflection. Accordingly, he asserts his conviction of second degree murder must be vacated, a verdict of guilty of manslaughter entered, and the matter remanded for resentencing.[17]

In reviewing the sufficiency of the evidence, an appellate court must determine if the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a

---

[17] Both parties mentioned self-defense and defense of others in their closing arguments and the jury charge included instructions regarding the same. However, defendant does not argue on appeal the killing was justified because it was committed in self-defense or in defense of others, and thus, it is not discussed in this opinion.

rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Lane, 20-181 (La. App. 5 Cir. 01/27/21), 310 So.3d 794, 804.

In making this determination, a reviewing court will not re-evaluate the credibility of witnesses or re-weigh the evidence. State v. Woods, 23-41 (La. App. 5 Cir. 11/15/23), 376 So.3d 1144, 1157, writ denied, 23-1615 (La. 05/29/24), 385 So.3d 700. The resolution of conflicting testimony rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. State v. Lavigne, 22-282 (La. App. 5 Cir. 05/24/23), 365 So.3d 919, 940, writ not considered, 23-1119 (La. 10/10/23), 370 So.3d 1086. It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence. State v. Mills, 04-489 (La. App. 5 Cir. 03/29/05), 900 So.2d 953, 960, writ denied, 05-1470 (La. 01/13/06), 920 So.2d 235. Thus, in the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. State v. Sly, 23-60 (La. App. 5 Cir. 11/02/23), 376 So.3d 1047, 1072.

Here, defendant was convicted of second degree murder, defined in pertinent part in this case, as the killing of a human being when the offender has a specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1 A(1). Specific intent is "that state of mine which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent need not be proven as a fact, but may be inferred from the circumstances surrounding the offense and the conduct of the defendant. Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person, as well as the extent and severity of the victim's injuries. State v. Thompson, 18-273 (La. App. 5 Cir. 11/28/18), 259 So.3d 1257, 1266, writ denied, 18-2077 (La. 09/06/19), 278 So.3d 372; State v. Burse, 19-381 (La. App. 5

Cir. 02/12/20), 289 So.3d 690, 695, writ denied, 20-650 (La. 11/24/20), 305 So.3d 104; State v. Bonilla, 15-529 (La. App. 5 Cir. 02/24/16), 186 So.3d 1242, 1253, writ denied, 16-567 (La. 05/02/16), 206 So.3d 881, cert. denied, 580 U.S. 901, 137 S.Ct. 239, 196 L.Ed.2d 183 (2016). Whether a defendant possessed the requisite intent in a criminal case is a question for the finder of fact, and a review of the correctness of this determination is under the Jackson standard. State v. Gonzalez, 07-449 (La. App. 5 Cir. 12/27/07), 975 So.2d 3, 8, writ denied, 08-228 (La. 09/19/08), 992 So.2d 949.

On appeal, defendant concedes the evidence was sufficient for a conviction of second degree murder because he admitted to shooting Salomon. However, defendant argues he should have been convicted of the responsive verdict of manslaughter because the evidence showed he shot Salomon in "a sudden passion or heat of blood."

In order for defendant to be convicted of manslaughter, the evidence would have had to show that the killing was committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. La. R.S. 14:31 A(1); State v. Monterroso, 22-390 (La. App. 5 Cir. 04/26/23), 361 So.3d 1177, 1190, writ denied, 23-745 (La. 11/21/23), 373 So.3d 447. Sudden passion and heat of blood distinguish manslaughter from murder, but they are not elements of the offense. Thompson, 259 So.2d at 1266. Instead, they are mitigating factors that may reduce the grade of the offense. Id.; State v. Lawson, 08-123 (La. App. 5 Cir. 11/12/08), 1 So.3d 516, 523. The defendant has the burden of proving these mitigating factors by a preponderance of the evidence. Burse, 289 So.3d at 696. Provocation and time for cooling are questions for the jury to determine under the standard of the average or ordinary person, one with ordinary self-control. Thompson, 259 So.2d at 1267. Provocation shall not reduce a homicide to manslaughter if the jury finds that the

offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed. La. R.S. 14:31 A(1). An argument alone does not constitute sufficient provocation to reduce a charge of second degree murder to manslaughter. Thompson, 259 So.2d at 1266-1267; State v. Berard, 15-318, (La. App. 3 Cir. 10/07/15), 2015 WL 5837674, writ denied, 15-2066 (La. 11/29/16), 211 So.3d 388; State v. Lemons, 38,269 (La. App. 2 Cir. 04/07/04), 870 So.2d 503, 508, writ denied, 04-1288 (La. 10/29/04), 885 So.2d 584; State v. Miller, 98-642 (La. App. 3 Cir. 10/28/98), 720 So.2d 829, 834, writ denied, 98-3119 (La. 05/14/99), 741 So.2d 659. Thus, the question for this court on review is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found that the mitigatory factors were not established by a preponderance of the evidence. Thompson, 259 So.2d at 1267.

In the instant case, the jury heard testimony and evidence that established defendant was sitting at the dining room table when he heard Salomon and his sister verbally arguing in their bedroom. Defendant got up from the table and walked to his bedroom where he retrieved a gun from a green bag inside his suitcase, which was in the closet. Defendant then loaded his gun before he went to Salomon and Alga's bedroom. Salomon was lying on the bed with his back against the headboard and Alga was standing by the bed. Defendant asked them what was going on and he exchanged words with Salomon. Defendant stated it was Salomon's time to die and shot him, using all of the bullets in his gun. Defendant then returned to his bedroom where he emptied the spent shell casings and reloaded his gun, in case Salomon was still alive. Further, defendant stated that his intention was to kill Salomon because he had threatened his sister fifteen days prior to the shooting. The evidence did not support a finding that a physical altercation occurred between Salomon and defendant's sister, or between Salomon and defendant, immediately prior to the shooting. A verbal argument alone is insufficient to reduce a second

degree murder conviction to manslaughter. Thompson, *supra*, Mills, *supra*. It has also been held that mere words or gestures, however offensive or insulting, will not reduce a second degree murder conviction to manslaughter. State v. Arias-Chavarria, 10-116 (La. App. 5 Cir. 9/28/10), 49 So.3d 426, 432, writ denied, 10-2432 (La. 02/25/11), 58 So.3d 460; State v. Mitchell, 39,202 (La. App. 2 Cir. 12/15/04), 889 So.2d 1257, 1263, writ denied, 05-132 (La. 04/29/05), 901 So.2d 1063.

Although Alga testified at trial that Salomon was grabbing her neck when defendant entered the room, and that Salomon lunged at defendant immediately prior to the shooting, the evidence established that when Alga initially spoke with the police at the scene and later at the police station, she did not mention that Salomon was choking her or that defendant saw Salomon choking her or that Salomon lunged at defendant immediately prior to the shooting. Instead, Alga conceded that she did not make a statement about the physical abuse or Salomon lunging at defendant until approximately a year after the shooting. Furthermore, defendant stated he did not see Salomon choking his sister, nor did he state that Salomon lunged at him during his statements to the police. The jury obviously did not believe that Alga's statement, made a year after the shooting, was credible, and apparently believed the statements made by Alga and defendant at the time of the shooting, which did not support a finding that Salomon was choking Alga when defendant entered or that Salomon lunged at defendant. Additionally, Dr. Troxclair's testimony established that Salomon was not shot at close range, which is consistent with defendant's testimony that he was by the door when he shot Salomon and sufficient to establish that Salomon did not lunge at defendant. Moreover, Dr. Troxclair testified that Salomon's arms were likely in front of his chest when the projectiles entered his chest. The testimony of Dr. Troxclair and the position of Salomon's body after the shooting support the allegation that Salomon did not lunge at defendant immediately

prior to the shooting. The credibility of witnesses, conflicting testimony, and the weighing of evidence, are factual matters within the sound discretion of the trier of fact. Lavigne, *supra*, Mills, *supra*, Thompson, *supra*.

Based on the evidence in this case, the jury could have reasonably concluded, and apparently did conclude, that 1) the verbal argument between Salomon and defendant's sister was insufficient provocation to deprive an average person of his self-control; 2) an average person's blood would have cooled between the choking incident fifteen days prior to the shooting and the shooting; 3) defendant did not see Salomon choking his sister immediately prior to the shooting; and 4) considering the conflicting testimony and the position of Salomon's body after the shooting, Salomon did not lunge at defendant immediately prior to the shooting. Viewing the evidence in the light most favorable to the State, we find a rational trier of fact could have found beyond a reasonable doubt that the evidence was sufficient to support the conviction of second degree murder. We further conclude that defendant failed to carry his burden of proving by a preponderance of the evidence the mitigating factors necessary to reduce his second degree murder conviction to manslaughter.

**ERRORS PATENT**

The record was reviewed for errors patent according to the mandates of La. C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La. 1975); and State v. Weiland, 556 So.2d 175 (La. App. 5 Cir. 1990). Our review reveals no errors patent that require corrective action.

**DECREE**

Based on the reasons stated above, defendant's conviction and sentence are affirmed.

<u>**CONVICTION AND SENTENCE AFFIRMED**</u>

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**AUGUST 7, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT
REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

# 23-KA-503

### E-NOTIFIED

24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE NANCY A. MILLER (DISTRICT JUDGE)
ANDREA F. LONG (APPELLEE)          THOMAS J. BUTLER (APPELLEE)          GWENDOLYN K. BROWN (APPELLANT)

### MAILED

HONORABLE PAUL D. CONNICK, JR.
(APPELLEE)
DISTRICT ATTORNEY
ERIC CUSIMANO (APPELLEE)
TAYLOR SOMERVILLE (APPELLEE)
ASSISTANT DISTRICT ATTORNEYS
TWENTY-FOURTH JUDICIAL DISTRICT
200 DERBIGNY STREET
GRETNA, LA 70053